IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TODD DITTMANN, } | |
| } | |
|    *Plaintiff*, } | |
| v. } | Civil Action No. H-09-402 |
| } | |
| D.B. ZWIRN & CO., L.P., } | |
| } | |
|    *Defendant*. } | |

## OPINION AND ORDER

Presently before the Court is Plaintiff's Original Verified Complaint, Motion for Temporary Restraining Order and Request for Preliminary Injunction (Doc. 1). The Court held a temporary restraining order hearing on February 12, 2009. For the reasons set forth below, the Court shall deny the plaintiff's request for injunctive relief.

I.      Relevant Factual Background[1]

On February 11, 2009, Plaintiff Todd Dittmann (Dittmann) filed suit against Defendant D.B. Zwirn & Co., L.P. (DBZ) alleging the following causes of action: (1) fraudulent inducement/fraud; (2) breach of express and/or implied contract; (3) *quantum meruit*; (4) breach of contract; (5) promissory estoppel; (6) unjust enrichment; (7) fraudulent conveyance; and (8) money had and received (Doc. 1). Dittmann has requested the Court to issue a temporary restraining order preventing DBZ from paying bonuses or other incentive compensation to any of its partners or employees; requiring DBZ to place five million dollars in an escrow account; and preventing DBZ from entering into any agreement or any change of control transaction with any entity that would inhibit, encumber, or otherwise diminish DBZ's entitlement to management

---

[1] The Court notes that the information presented in this section is based on allegations in and exhibits to the plaintiff's complaint, as well as exhibits the Court admitted at the temporary restraining order hearing.

fees (or the amount of such management fees) from any of the investment funds for which DBZ currently provides management services.

On March 31, 2004, Highbridge/Zwirn Capital Management, LLC (HZ) extended Dittmann an offer of employment to commence on or before April 5, 2004. (Def.'s Ex. 1 at 1). Dittmann's primary responsibilities as Senior Vice President – Direct Debt Investments would be to source, analyze, and execute public and private investment opportunities, to monitor existing investments, and to perform such other investment-related tasks as appropriate. (*Id.*).

With respect to Dittmann's compensation, he would receive a base salary of $180,000 per annum, as well as a minimum bonus of $320,000. (*Id.*). His bonus could exceed this amount in accordance with a formula pursuant to which he would receive a portion of the incentive received by HZ or its affiliate attributable to his activity. (*Id.*). With respect to bonus compensation, HZ's offer letter to Dittmann states, in pertinent part,

> With respect to calendar years after 2004, you may be eligible for an annual bonus that would be paid from compensation pools or incentive received by [HZ] . . . with respect to the Highbridge/ Zwirn Special Opportunities Funds, in accordance with such formula. Notwithstanding the foregoing, the amount of compensation that you might receive with respect to calendar years after 2004, if any, from such pools or incentive will be in *my sole discretion* and would be a function of HZ's success, the success of the Highbridge/Zwirn Special Opportunities Funds and your contribution to the foregoing.
>
> With respect to calendar years after 2004, any such annual bonus that you may receive may be paid out in installments over the course of the following calendar year, consistent with HZ's general payment practices and contingent upon both the receipt by HZ . . . of sufficient incentive compensation and your continued employment by HZ through the date any final contingent bonus payment is to be paid to you by HZ[.]

(*Id.* at 1-2) (emphasis added). The offer letter further stated that all compensation decisions and calculations would be made in good faith. (*Id.* at 2).

In March 2005, Dittmann received his bonus consistent with the terms of the offer letter. (Pl.'s Compl. Doc. 1 at ¶ 11). In March 2006 and March 2007, Dittmann received his bonus consistent with the formula and calculations in the profitability spreadsheets for each year. (*Id.* at ¶¶ 12-14).

In 2007, Dittmann allegedly generated profits of approximately $74 million for DBZ and its shareholders. (*Id.* at ¶ 15). Dittmann determined that his bonus would be approximately $3,282,025.00 in accordance with the formula and calculations in the profitability spreadsheet for 2007. (*Id.*). However, in early 2008, Dittmann learned that his bonus for 2007 would be discounted by approximately 20% and that the formula previously used in the profitability spreadsheets would not apply to the work he performed and profits he generated in 2008 and beyond. (*Id.* at ¶ 16).

Subsequently, in March 2008, Dittmann received two letters from DBZ, one from Lawrence Cutler, Chief Operating Officer, (Pl.'s Compl. Doc. 1 Ex. A) and the other from David Lee, President (Pl.'s Compl. Doc. 1 Ex. B). Both of these letters informed Dittmann that he would be eligible to receive a bonus of $2,625,620.00 subject to certain terms and conditions. (*Id.*). The bonus would be paid as follows: 35% ($918,967.00) on March 14, 2008, 35% ($918,967.00) on April 4, 2008, and 30% ($787,686) in August 2008. (Pl.'s Compl. Doc. 1 Ex. A). The payment of any and all portions of the bonus was conditioned upon the receipt by DBZ of sufficient incentive compensation on the date the amount was to be paid and on Dittmann's compliance with his obligations under the Employee Confidentiality, Noncompete and Non-Solicit Agreement. (*Id.*). If, however, there was insufficient incentive compensation as of a payment date to pay the portion of the bonus to be paid on that date, DBZ would pay Dittmann that amount as soon as practicable after it received sufficient incentive compensation. (*Id.*). If

there was not sufficient incentive compensation by the end of 2008, however, Dittmann's right to any unpaid portions of the bonus would be forfeited. (*Id.*).

Dittmann received the first two installments of his bonus in March and April 2008. (Pl.'s Compl. Doc. 1 at ¶ 22). He was not, however, paid the third installment. (*Id.*). Dittmann received correspondence from DBZ on October 1, 2008, about the final installment of his bonus. (Pl.'s Compl. Doc. 1 Ex. C). The letter stated that, if, by December 31, 2008, Dittmann had not been paid the full amount of his bonus pursuant to correspondence he received from DBZ in March 2008 and if DBZ received incentive compensation from the HCM/Z Special Opportunities Fund after December 31, 2008, Dittmann would then be paid the amount owed to the extent it did not exceed the incentive compensation received at that time. (*Id.*). If the unpaid portion of the bonus exceeded 11% of the incentive compensation received by DBZ at that time, any excess would be payable out of the next incentive compensation received from the HCM/Z Special Opportunities Fund. Payment was conditioned upon Dittmann signing the letter and continuing to comply with the Employee Confidentiality, Noncompete, and Non-Solicit Agreement. (*Id.*). By signing the letter, however, Dittmann would have "waive[d] and release[d] any claims against the Company (or its affiliates) that [he had] or that may [have arisen] under the Bonus Letter." (*Id.*). Dittmann refused to sign the letter and requested the amount DBZ owed him. (Pl.'s Compl. Doc. 1 at ¶ 23). Shortly thereafter, DBZ terminated Dittmann's employment. (*Id.* at ¶ 24).

Dittmann argues that he is owed the third installment of his bonus, as well as bonus compensation for profits he earned in 2008 and compensation for his work on the new venture. With respect to the latter two, Dittmann made several allegations about representations that DBZ made about the new venture, his role in its formation and leadership, and how he relied

on these representations in choosing to remain at DBZ.  In support of his request for injunctive relief, Dittmann asserts that certain DBZ employees have been asked to conceal from Dittmann the fact that they have received or will receive the compensation they are owed and that DBZ is in a state of financial distress.

II.        Temporary Restraining Order

A party seeking a temporary restraining order or preliminary injunction must establish the following elements: (1) there is a substantial likelihood the party will prevail on the merits; (2) a substantial threat exists that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendants; and (4) the granting of the preliminary injunction will not disserve the public interest.  *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363 (5th Cir. 2003); *see also Khan v. Fort Bend Indep. Sch. Dist.*, 561 F. Supp. 2d 760, 763 (S.D. Tex. 2008).  A preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has "clearly carried the burden of persuasion" on all four elements.  *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003) (quoting *Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

III.       Analysis

The Court's jurisdiction to provide equitable relief, such as temporary restraining orders and preliminary injunctions, is limited.  In *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), the Supreme Court held that a district court does not have the authority to issue an injunction preventing a defendant from transferring assets in which no lien or equitable interest is claimed.  In *Grupo*, an investor group purchased $75 million in notes issued by Grupo Mexicano, a Mexican holding company.  A few years later,

Grupo began having serious financial difficulties. Eventually the investor group accelerated the principal amount of the notes and, a day later, filed suit in the Southern District of New York. Alliance's complaint alleged that Grupo "'is at risk of insolvency, if not insolvent already' . . . [and] was dissipating its most significant asset[.]"  *Id.* at 312.  Alliance requested the Court to enjoin Grupo from transferring its most important assets to protect Alliance's ability to recover breach-of-contract damages in the amount of $80.9 million.  *Id.*  The district court granted the injunction and the Second Circuit affirmed.

The Supreme Court, reversed, holding that the issuance of an injunction was beyond the equitable power of the district court.  The Court reasoned that the scope of a federal court's equitable power was frozen in the 18th century by the Judiciary Act of 1789 which gave federal courts jurisdiction over "all suits . . . in equity."  *Grupo,* 527 U.S. at 318.  In practice, courts interpret the scope of their equitable power by determining whether the power would have been exercised "by the English Court of Chancery at the time of the separation of the two countries."  *Id.* at 318 (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939)).

Looking to the historical use of equitable powers, the Court concluded that no authority existed to enjoin an entity from exercising control over its assets prior to entry of a judgment.  The court referred to the historical concept that "an unsecured creditor has no rights at law or in equity in the property of his debtor" prior to entry of a judgment.  *Grupo,* 527 U.S. at 330.  One treatise, quoted by the Court, stated:

> A rule of procedure which allowed any prowling creditor, before his claim was definitely established by judgment, and without reference to the character of his demand, to file a bill to discover assets, or to impeach transfers, or interfere with business affairs of the alleged debtor, would manifestly be susceptible of the grossest

- 6 -

>   abuse. A more powerful weapon of oppression could not be placed at the disposal of unscrupulous litigants.

*Id.* (quoting Wait, *Fraudulent Conveyances* § 73, at 110-111).

In reaching its holding, the Court distinguished two cases which allowed injunctions to preserve an entity's assets. In *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940), purchasers sued under the Securities Act of 1933, alleging the fraudulent sale of certificates. The remedy sought by the purchasers was rescission of the contract and restitution of the consideration given. *See Grupo*, 527 U.S. at 325. Immediately, before the court could address their claim under the Securities Act, the purchasers requested that the court enter an injunction preventing the company from transferring any assets, citing evidence that the company was at the point of insolvency and in the process of liquidating its holdings. *Id.* The Supreme Court held that entry of an injunction was proper because the complaint stated a cause of action for equitable relief, rescission, and restitution. In *Grupo*, the Court explained that the result in the *Decker*t case would have been different if the purchasers sought only legal relief. *Id.* at 325. In other words, preliminary equitable relief, such as an injunction, is permitted if the final relief sought is equitable. However, if the only relief sought is legal in nature, such as damages or the collection of a debt, equitable preliminary relief is not available. *Id.*

In *United States v. First Nat. City Bank*, 379 U.S. 378 (1965), the government, in a suit to enforce a tax assessment lien, requested a preliminary injunction to prevent the taxpayer's assets from being transferred by a third-party bank before enforcement. The Court held that the injunction was appropriate because Congress specifically gave "district courts the power to grant injunctions necessary and appropriate for the enforcement of the internal revenue laws." *Grupo*, 527 U.S. at 325 (internal quotations and citations omitted). The *Grupo* Court emphasized that the relevant factor in *First National* was not the general equitable powers of the

Court under the judiciary act, but rather the statutory authority to enter preliminary injunctions in tax cases. *Id.* at 326.

Therefore, the Supreme Court's holding in *Grupo* establishes that, absent a statutory grant of authority, a district court may not grant a preliminary equitable remedy in an action at law.  In other words, equitable devices may not be used by a court exercising jurisdiction at law.

In the instant case, Dittmann has requested the Court to issue a temporary restraining order (1) to prevent DBZ from paying bonuses or other incentive compensation to any of its partners or employees; (2) to require DBZ to place five million dollars in an escrow account; and (3) to prevent DBZ from entering into any agreement or any change of control transaction with any entity that would inhibit, encumber, or otherwise diminish DBZ's entitlement to management fees (or the amount of such management fees) from any of the investment funds for which DBZ currently provides management services.

The ultimate relief Dittmann seeks is not equitable; it is legal.  Dittmann's requests for temporary injunctive relief are made in an effort to preserve DBZ's financial status quo so that DBZ has the resources with which to pay Dittmann a damages award for the last third of his bonus compensation from 2007, bonus compensation for profits he earned in 2008, and compensation for his work on the new venture should his case ultimately be successful.  Because the final relief sought by Dittmann is not equitable, the Court lacks the authority to award a preliminary equitable remedy under *Grupo*.

IV.	Conclusion

Accordingly, the Court hereby ORDERS that the plaintiff's request for injunctive relief is DENIED. The Court further ORDERS that this matter is referred to Magistrate Judge Frances Stacy for a scheduling conference that will set an expedited schedule for discovery and trial on the merits.

SIGNED at Houston, Texas, this 13th day of February, 2009.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE