UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TODD DITTMANN, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-09-402 |
| | § | |
| D.B. ZWIRN & CO., L.P., | § | |
| | § | |
| Defendant. | § | |

## **OPINION & ORDER**

Pending before the Court are Defendant D.B. Zwirn & Co., L.P.'s ("DBZ") Motion to Dismiss Fraud Claims (Doc. 23) and Memorandum Supporting its Motion to Dismiss Fraud Claims (Doc. 24) and Plaintiffs Todd Dittmann ("Dittmann") and Susan Chen's ("Chen") Response to Defendant's Motion to Dismiss (Doc. 35).

Also before the Court are Plaintiff Dittmann's Motion for Partial Summary Judgment and Brief in Support (Doc. 22), Defendant DBZ's Response to Plaintiff Dittmann's Motion for Partial Summary Judgment and Cross-Motion for Partial Summary Judgment, and Brief in Support (Doc. 36), and Plaintiff Dittmann's Response to Defendant's Cross-Motion for Partial Summary Judgment and Reply in Support of Plaintiff's Motion for Partial Summary Judgment (Doc. 39).

In addition, before the Court are Plaintiffs Dittmann and Chen's Motion for Partial Summary Judgment and Brief in Support (Doc. 34), Defendant DBZ's Response to Plaintiffs' Second Motion for Partial Summary Judgment and Cross-Motion for Partial Summary Judgment, and Brief in Support (Doc. 40), and Plaintiffs Chen and Dittmann's Response to Defendant's Cross-Motion for Partial Summary Judgment and Reply in Support of Plaintiffs' Motion for Partial Summary Judgment (Doc. 46).

Finally, before the Court are Defendant DBZ's Supplemental Motion for Summary Judgment (Doc. 55), which, together with DBZ's two prior cross-motions for summary judgment (Docs. 36 and 40) address all of Plaintiffs' claims, and Plaintiffs Dittmann and Chen's Response to Defendant's Motion for Summary Judgment (Doc. 63).

Upon review and consideration of all these motions and the relevant legal authority, and for the reasons explained below, the Court finds that Defendant DBZ's motions for full summary judgment (Docs. 36, 40, and 55) should be granted, that Plaintiff Dittmann's and Chen's motions for partial summary judgment (Docs. 22 and 34) should be denied, and that DBZ's motion to dismiss fraud claims (Doc. 23) should be denied as moot.

I.  Background and Relevant Facts

This is a breach of contract for employment compensation case in federal court pursuant to diversity jurisdiction.  28 U.S.C. § 1332(a)(1).  Defendant D.B. Zwirn & Co., L.P. and its predecessor in interest, Highbridge Capital Management, LLC (hereinafter, collectively "DBZ"), is a New York-based hedge fund specializing in making loans to small and medium-sized companies.  By letter dated March 22, 2004, DBZ offered, and Plaintiff Dittmann accepted, a position as a senior vice president of direct debt investments.  (Doc. 10 at 2.)  In this position, Dittmann's primary responsibility was to find, analyze, and execute public and private investment opportunities, to manage existing investments, and to perform other investment-related tasks as appropriate.  (*Id.*)  Dittmann's compensation consisted of a base salary of $180,000 per annum, as well as a minimum bonus of $320,000 for calendar year 2004.  (*Id.*)  His bonus could exceed this amount in accordance with a formula pursuant to which he would receive a portion of the incentive income received by DBZ or its affiliate that was attributable to

his investment performance. (*Id.*) DBZ's offer letter to Dittmann states, in pertinent part:

> Your salary will be $180,000 per annum, payable semi-monthly. With respect to calendar year 2004, you will receive a minimum bonus of $320,000 (to be paid by 2/28/05), which bonus may exceed such amount in accordance with a formula pursuant to which you will receive a portion of the incentive income received by H/Z (or its affiliate) that is attributable to your activity. Notwithstanding the foregoing, any amount in excess of such $320,000 ***will be in my sole discretion*** and would be a function of H/Z's success, the success of the Highbridge/Zwirn Special Opportunities Funds and your contribution to the foregoing. [. . . .] With respect to calendar years after 2004, ***you may be eligible for an annual bonus*** that would be paid from compensation pools or incentives received by H/Z (or its affiliate) with the respect to the Highbridge/Zwirn Special Opportunities Funds, in accordance with such formula. Notwithstanding the foregoing, the amount of compensation that you might receive with respect to calendar years after 2004, ***if any***, from such pools or incentive ***will be in my sole discretion*** and would be a function of H/Z's success, the success of the Highbridge/Zwirn Special Opportunities Funds and your contribution to the foregoing.
>
> With respect to calendar years after 2004, ***any such annual bonus that you may receive may be paid out in installments over the course of the following calendar year***, consistent with H/Z's general payment practices and ***contingent upon both the receipt by H/Z's (or its affiliate) of sufficient incentive compensation and your continued employment by H/Z through the date any final contingent bonus payment is to be paid to you by H/Z (or its affiliate).***
>
> All computations and determinations in respect of compensation ***shall be made in good faith in H/Z's sole discretion.***
>
> . . .
>
> While this letter agreement is intended to summarize our offer, it shall not be used to interpret or in any way govern the terms of your employment relationship with H/Z. You understand that you will be an at-will employee and that either you or H/Z may terminate the relationship at will, with or without cause, at any time.

(*Id.* at 1–2, emphases added.) Highbridge was a client of DBZ. (Doc. 55 at 3.)

In March 2005, Dittmann received a bonus generally consistent with the terms of the offer letter. (Doc. 21 at ¶ 12). Likewise, in March 2006 and March 2007, Dittmann again received bonuses generally consistent with the formula and calculations in the profitability spreadsheets for each year. (*Id.* at ¶ 15.) In 2007, Dittmann alleges to have generated profits of approximately $74 million for DBZ. (*Id.* at ¶ 16.) Based on DBZ's formulas in the profitability spreadsheet for 2007, Dittmann calculated that his bonus would be $3,282,025. (*Id.*) However, in early 2008, Dittmann learned that his bonus for 2007 would be discounted by approximately 20% and that the formula previously used in the profitability spreadsheets would not apply to the work he performed and profits he generated in 2008 and beyond. (*Id.* at ¶ 17.)

Subsequently, in March 2008, Dittmann received two nearly identical letters from DBZ, one from Lawrence Cutler ("Cutler"), DBZ's Chief Operating Officer (Doc. 21-2 at 1, exh. A), and the other from David Lee ("Lee"), DBZ's President (*Id.* at 3, exh. B). Both letters informed Dittmann that he would "be eligible to receive a bonus" of $2,625,620.00 for his work in 2007, subject to certain terms and conditions. (*Id.*). Dittmann's bonus for 2007 would now be paid as follows: 35% ($918,967.00) on March 14, 2008, 35% ($918,967.00) on April 4, 2008, and the remaining 30% ($787,686) in August 2008. (*Id.*) Further, the letter informed Dittmann that "[t]he payment of any and all portions of the Bonus is conditioned upon (i) the receipt by [DBZ] of sufficient incentive compensation on the date such amount is to be paid (each, a "Payment Date") and (ii) on [Dittmann's] compliance with [his] obligations under the Employee Confidentiality, Noncompete and Non-Solicit Agreement . . . ." (*Id.*). If, however, there was insufficient "incentive compensation on a Payment Date to pay the portion of the Bonus to be paid on such Payment Date," DBZ promised to pay Dittmann that amount "as soon as practicable in 2008 after receipt by [DBZ] of sufficient incentive compensation; <u>provided</u>, <u>however</u>, that if

4 / 14

there is not sufficient incentive compensation by the end of calendar year 2008, [Dittmann's] right to any unpaid portion(s) of the Bonus shall be forfeited." (*Id.*, emphasis in the original.)

Dittmann continued to work for DBZ. (Doc. 21 at ¶ 21.) In March and April 2008 Dittmann received the first two installments of his bonus, but not the third installment, which was due in August. (*Id.* at ¶ 23.) On October 1, 2008, Dittmann received a letter from Lee pertaining to the final installment of his 2007 bonus, stating that:

> If, by December 31, 2008, you have not been paid the full amount of the Bonus payable to you under certain conditions during 2008 pursuant to the letter to you dated March 13, 2008 (the "Bonus Letter"), and if [DBZ] receives incentive compensation from the HCM/Z Special Opportunities Fund ("HCM/Z") subsequent to December 31, 2008, you will be paid the then unpaid amount of the Bonus, to the extent such unpaid amount does not exceed such incentive compensation received at such time. If the unpaid portion of the Bonus exceeds 11% of the incentive compensation received by [DBZ] at such time, any excess shall be payable out of the next incentive compensation received by [DBZ] from HCM/Z (and if necessary each subsequent receipt of incentive compensation by [DBZ] from HCM/Z), subject to the same percentage limitation, until the full amount of the Bonus has been paid or forfeited (as described below). Each payment will be made within thirty (30) days of [DBZ]'s receipt of incentive compensation from HCM/Z (the "Payment Dates"). [DBZ] will make a reasonable effort to keep you apprised of the progress on collection on a quarterly basis. Nothwithstanding the foregoing, payment hereunder are conditioned upon (i) you signing this letter on or before December 31, 2008, and (ii) your compliance with your obligations under the Employee Confidentiality, Noncompete, and Non-Solicit Agreement between you and [DBZ] as of the applicable Payment Date(s).

(Doc. 21-2 at 4, exh. C.) The letter ended with a clause stating that "[b]y signing this letter, you hereby waive and release any claims against [DBZ] (or its affiliates) that you have or that may arise under the Bonus Letter." (*Id.*) Dittmann refused to sign the letter and requested the final 2007 bonus payment he claimed was owed him, but DBZ refused. (Doc. 21 at ¶ 24.) Shortly thereafter, DBZ terminated Dittmann's employment. (*Id.* at ¶ 25.)

Dittmann alleges that he is owed the third installment of his 2007 bonus, as well as bonus compensation for profits he earned in 2008 and compensation for his work on a new DBZ business venture. With respect to the latter, Dittmann alleges that DBZ made representations to him about a possible new business venture and his potential role in its formation and leadership, and that he relied on these representations in choosing to remain at DBZ, despite the underpayment of his 2007 bonus. (Doc. 21 at ¶¶ 21–22.)

Plaintiff Chen was hired as an associate by DBZ in October 2002 and began working there full-time in August 2003. (*Id.* at ¶ 29). Chen's offer letter dated October 1, 2002, provided for a $110,000 annual salary and a $7,500 signing bonus. (Doc. 63, exh. 3.) Chen signed and accepted the offer the next day. (*Id.*) The offer letter states that Chen "may be eligible for an end-of-year bonus which would be paid from a compensation pool received by Highbridge Capital Management ("HCM") for acting as the Trading Manager of Highbridge[,]" but that the "amount of compensation which [Chen] might receive, if any, from the pool will be at the sole discretion of Glenn Dubin, Henry Swieca, and [Daniel Zwirn]." (*Id.*) By 2007, Chen was a managing director at DBZ. (Doc. 21 at ¶ 29; Doc. 64, exh. 4.) Each year from 2004 to 2007, Chen was paid a bonus calculated by DBZ's standard formula. (Doc. 21 at ¶¶ 30–33.) In 2007, Chen alleges to have generated profits of approximately $45 million for DBZ and accordingly determined that her bonus should be approximately $2.4 million. (*Id.* at ¶ 35.) Similar to DBZ's course of conduct with Dittmann, in early 2007, DBZ informed Chen that her bonus would be approximately 20% less than that calculated by the previously used formula. (*Id.* at ¶ 36.) Likewise, DBZ informed Chen of the possibility of a new business venture in which she might participate. (*Id.*) Chen continued to work for DBZ. (*Id.*)

In March 2008, Chen received a letter from DBZ indicating that her 2007 bonus of

$1,785,490 would be paid in three installments in March, April, and August 2008, but, if DBZ did not receive "sufficient incentive compensation by the end of calendar year 2008, [Chen's] right to any unpaid portion(s) of the Bonus shall be forfeited." (*Id.* at ¶ 38; Doc. 64, exh. 7.) Chen received the first two payments of her 2007 bonus in March and April 2008, but not the third payment she expected in August 2008. (Doc. 21 at ¶ 39.) On October 1, 2008, Chen received a letter from DBZ stating that, "if by December 31, 2008, you have not yet been paid the full amount of the Bonus payable to you . . . pursuant to the letter dated March 13, 2008, and if [DBZ] receives incentive compensation from the HCM/Z Special Opportunities Fund subsequent to December 31, 2008, you will be paid the then unpaid amount of the Bonus, to the extent that such unpaid amount does not exceed such incentive compensation received at such time." (*Id.* at ¶ 40.) Further, the new promise was conditioned on Chen signing the "letter on or before December 31, 2008[,]" thereby "waiv[ing] and releas[ing] any claims against [DBZ] that Chen has or that may arise under the [March 31, 2008] Bonus Letter," and Chen's continued compliance with her "Confidentiality, Noncompete and Non-Solicit Agreement" with DBZ. (*Id.*) Chen did not sign the letter and requested the third portion of her 2007 bonus, which DBZ did not pay. (*Id.*)

On February 11, 2009, Dittmann filed suit against DBZ. (Doc. 1.) Dittmann requested a temporary injunction, which was denied by this Court. (Doc. 6.) Plaintiffs Dittmann and Chen filed their First Amended Complaint on June 30, 2009, alleging the following causes of action: fraud, breach of express or implied contract, *quantum meruit*, breach of contract, promissory estoppel, unjust enrichment; fraudulent conveyance, money had and received, and violation of New York State Labor Law article 6, sections 193 and 198. (Doc. 21 at ¶¶ 46–76.) Plaintiffs seek actual and exemplary damages, as well as attorneys' fees and costs. (*Id.* at ¶¶ 77–82.)

Defendant DBZ now moves for summary judgment. (Docs. 36, 40 and 55.) Plaintiffs Dittmann and Chen move for partial summary judgment on their breach of contract and labor law claims. (Docs. 22 and 34.)

II.  Summary Judgment Standard

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). Moreover, if the party moving for summary judgment bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (the movant with the burden of proof "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor") (emphasis in original).

A plaintiff moving for summary judgment must satisfy its burden by submitting proof that establishes all elements of its cause of action as a matter of law. *San Pedro v. U.S.*, 79 F.3d 1065, 1068 (11th Cir. 1996). Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323–24. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Instead, the nonmoving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." W*ebb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139–40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075). The nonmovant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Nor is the court required by Rule 56 to sift through the record in search of

evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). The party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198–200 (5th Cir. 1988). The nonmoving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).

III. Discussion

Plaintiffs Dittmann and Chen accepted offers to work for DBZ, a hedge fund management company. Their offer letters made clear they would be compensated through a combination of a base salary and bonus. Plaintiff Dittmann was guaranteed a bonus of at least $320,000 for calendar year 2004 and Plaintiff Chen received a $7,500 signing bonus. (Doc. 10 at 2; Doc. 64, exh. 3.) Any other bonus payments to Dittmann were contingent on performance, receipt by DBZ of sufficient incentive compensation, continued employment through the date of any bonus payment, and were at the sole discretion of DBZ. (Doc. 10 at 2.) Further, the bonuses might be paid installments. (*Id.*) Chen's bonus, "if any, . . . [was] at the sole discretion of Glenn Dubin, Henry Swieca, and [Daniel Zwirn]." (Doc. 64, exh. 3.) Despite these myriad conditions and their lower than expected bonuses in 2007, Plaintiffs Dittmann and Chen continued to work

for DBZ.  A bonus is not a guaranteed portion of an employee's salary.  DBZ clearly reserved the right to pay bonuses of any amount, or no bonuses at all, and Plaintiffs clearly accepted those conditions on their employment and compensation.  Nevertheless, Plaintiffs now argue that their bonuses were "guaranteed" and that they are victims of a fraud perpetrated by DBZ to convince them to continue working there.

First, Plaintiffs contend that a separate oral or implied contract guaranteed payment of their bonuses, in contradiction to the offer letters, which clearly state that the bonuses are discretionary.  Texas does not recognize a conflicting implied contract where there is an enforceable express contract between the parties on the same subject.  *Musick v. Pogue*, 330 S.W.2d 696, 699 (Tex. Civ. App.—San Antonio 1959, *ref. n.r.e.*); *Noble Exploration, Inc. v. Nixon Drilling Co., Inc.*, 794 S.W.2d 589, 592 (Tex. App.—Austin 1990, *no writ*).  Plaintiffs' contentions regarding an oral contract also fail, as their offer letters contain a merger clause clearly precluding changes not in writing: "This letter agreement may not be amended or modified except by the mutual consent of the parties in a written instrument explicitly denominated as an amendment to this letter agreement."  (Doc. 55, exhs. C and D.)

Next, Plaintiffs argue that DBZ's March 2008 letters to Dittmann and Chen regarding their 2007 bonuses "guaranteed" payment of those bonuses subject only to two conditions precedent: "(i) the receipt by [DBZ] of sufficient incentive compensation on the date such amount is to be paid . . . and (ii) on [Plaintiffs'] compliance with [their] obligations under the Employee Confidentiality, Noncompete and Non-Solicit Agreement . . . ."  (Doc. 21-2 at 1, exh. A; Doc. 64, exh. 7.)  Plaintiffs assert that this letter contains a new promise modifying the original employment agreement.  (Doc. 22 at 1–2; Doc. 34 at 2; Doc. 63 at 3–4.)  In part, Plaintiffs base their argument on language in the letter stating that: "[i]f you make unauthorized

disclosure of such compensation or the fact that **<u>such compensation is guaranteed</u>**, [DBZ] and its affiliates reserve the right to withhold payment of any portion of such compensation . . . ." (Doc. 64, exh. 7, emphasis added.) However, the letter goes on to state that "[n]othing herein changes your employment status, which will remain 'at will,' and this letter is not intended to guarantee your employment for any duration." (*Id.*) More specifically, the clause, "such compensation is guaranteed," is properly read not as a guarantee of their bonus payments, but, rather, as another reason DBZ could withhold payment, if Plaintiffs made such unauthorized disclosures. Read in context, DBZ clearly retained all its rights under the original employment agreement and the letters' promises regarding payment of Plaintiffs Dittmann's and Chen's 2007 bonuses are subject to all the conditions of the original offer letters. Defendant DBZ is therefore entitled to summary judgment on all contract claims.

Premised on the same argument, Plaintiffs contend that because DBZ's March 2007 letters "guaranteed" payment of their 2007 bonuses, these bonuses are more properly characterized as wages, and therefore DBZ's failure to pay the third installment of their bonuses violated Section 193 of the New York State Labor Law. (Doc. 34 at 5.) However, to the extent it may apply to the instant case, New York Labor Law does not cover bonuses or other discretionary compensation. *Canet v. Travelstead*, 917 F.Supp. 969, 996 (E.D.N.Y. 1996) ("incentive compensation does not constitute 'wages' under the New York Labor Law."). Because the Court finds that, as a matter of law, DBZ's March 2007 bonus letters did not modify Plaintiffs' employment agreements, their New York Labor Law claim fails.

Plaintiffs also cannot recover under common law quasi-contractual and equitable claims, such as their claims for *quantum meruit*, unjust enrichment, promissory estoppel, and money had and received. Such forms of relief are barred when a relationship is governed by a valid,

enforceable, express contract. *Inglish v. Prudential Ins. Co. of Am.*, 928 S.W.2d 702 (Tex. App.—Houston [1st Dist.] 1996, *writ denied*) (*quantum meruit* and unjust enrichment are predicated on absence of express contract controlling the circumstances); *Tiger Truck, LLC v. Bruce's Pulp and Paper, LLC*, 282 S.W.3d 176, 184 (Tex. App.—Beaumont 2009, *no pet.*) ("Because a valid contract existed, the theory of promissory estoppel does not apply."); *Prince v. Miller Brewing Co.*, 434 S.W.2d 232, 240 (Tex. Civ. App.—Houston [1st Dist.] 1968,*writ ref'd n.r.e.*) (same); *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) ("When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement.").

With regards to Plaintiffs' fraud theory, under Texas law, Dittmann and Chen must show that DBZ made (1) a material representation; (2) that was false when made; (3) that DBZ either knew the statement to be false or made the assertion without knowledge of its truth; (4) that DBZ intended Dittmann and/or Chen to act on the statement; (5) that they actually relied upon the statement in so acting; and (6) that they were injured as a result. *Malacara v. Garber*, 353 F.3d 393, 403–4 (5th Cir. 2003). Dittmann and Chen allege that DBZ's representations regarding a potential new business venture were knowingly false, made with intent to keep them working for DBZ, and actually had that effect, to their detriment. However, Plaintiffs fail to point to any evidence indicating that these representations were false or made without knowledge of their truth. DBZ asked Dittmann to travel to Chicago to review a similar venture there and requested that he submit a proposal regarding a potential structure for the team, a compensation model for Dittmann and other employees, and the type of office space required. (Doc. 21 at ¶ 19.) Because Dittmann and Chen fail to point to any material representations made by DBZ or its agents that were false at the time and made knowingly or without regard to their truth, these claims must

fail.

IV.  Conclusion

Plaintiffs Dittmann and Chen worked in a high risk industry with the potential for high rewards.  For several years they generated outsized returns for their employer and were compensated accordingly.  When Defendant DBZ's business declined through no apparent fault of the Plaintiffs, DBZ reduced their bonuses and ultimately failed to pay a final portion of their 2007 bonuses, all in compliance with the terms of the original employment agreement accepted by Plaintiffs.

Accordingly, it is hereby ORDERED that Defendant D.B. Zwirn & Co., L.P.'s motions for summary judgment (Docs. 36, 40, and 55) are GRANTED.

It is further ORDERED that Plaintiffs Todd Dittmann's and Susan Chen's motions for partial summary judgment (Docs. 22 and 34) are DENIED.

It is further ORDERED that Defendant D.B. Zwirn & Co., L.P.'s motion to dismiss fraud claims (Doc. 23) is DENIED as moot.

SIGNED at Houston, Texas, this 8th day of February, 2010.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE